JH

**FILED**

MAY 2 5 2007
MAY 25, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DAD'S PRODUCTS COMPANY, INC., on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> BNSF RAILWAY COMPANY, CSX TRANSPORTATION, INC., KANSAS CITY SOUTHERN RAILWAY COMPANY, NORFOLK SOUTHERN RAILWAY COMPANY, and UNION PACIFIC RAILROAD COMPANY, <br><br> Defendants. | **07CV2954** <br> **JUDGE DER-YEGHIAYAN** <br> **MAG.JUDGE DENLOW** <br><br> **CLASS ACTION COMPLAINT and DEMAND FOR JURY TRIAL** |

Plaintiff Dad's Products Company, Inc. ("Dad's Products" or "Plaintiff"), by and through

undersigned counsel, complains and alleges upon information and belief except as to those

paragraphs applicable to Plaintiff individually, which are based on personal knowledge. Plaintiff

brings this action individually and on behalf of a class of all those similarly situated, as defined

below, seeking treble damages under the antitrust laws of the United States against Defendants,

and alleges as follows:

**NATURE OF THE ACTION**

1.      This antitrust class action charges that five United States-based railroads have

engaged in price fixing in violation of Section 1 of the Sherman Antitrust Act of 1890 ("Sherman

Act"), 15 U.S.C. § 1. Plaintiff brings this action to recover treble damages under Section 1 of the

Sherman Act, pursuant to Section 4 of the Clayton Act of 1914 ("Clayton Act"), 15 U.S.C. § 15.

2.      Plaintiff brings this action on behalf of itself and a class of entities who purchased

unregulated rail freight transportation services directly from Defendants and their co-conspirators

from July 1, 2003 to the present (the "Class Period") and who were assessed a rail fuel surcharge

for the agreed-upon transportation (the "Class"). As used herein, the term "unregulated" refers

to rail freight transportation services for which rates are set by private contracts or through other

means exempt from rate regulation under federal law.

3.      During the Class Period, Defendants conspired to fix, raise, maintain, and/or

stabilize prices of rail freight transportation services sold in the United States through use of so-

called "rail fuel surcharges" added to customers' bills. A rail fuel surcharge (hereafter, "Rail

Fuel Surcharge") is a separately-identified fee added to the base rate charged by railroads for

agreed-upon transportation.

4.      Defendants maintained uniformity of Rail Fuel Surcharges throughout the Class

Period by agreeing to compute the surcharges as a percentage of the rail-freight transport base

rate and by agreeing upon common indices, timing, and trigger points for adjusting the

percentages. Although the purported purpose of a Rail Fuel Surcharge is to allow recovery by a

railroad of an unanticipated fuel cost increase, Defendants, by working in concert, were able to

use Rail Fuel Surcharges as revenue generators and profit centers.

5.      The manner in which Defendants set their Rail Fuel Surcharges was both

arbitrary, because numerous other mechanisms were available, and flawed, because other

available mechanisms were superior means of recovering unanticipated fuel costs as opposed to

simply inflating profits. Defendants would not have naturally made the arbitrary choices they

did if they had acted unilaterally. Without working in concert, Defendants would not have been

able to set and maintain their Rail Fuel Surcharges at their inflated levels.

6.      During the Class Period, some industry analysts observed the "convergence" in

the Rail Fuel Surcharge methodologies adopted by Defendants and found this phenomenon

-2-

puzzling given the flaws in the methodologies adopted and the fact that the independent adoption

of these methodologies would not be in each railroad's self interest. For example, after

completing a study in 2003 concluding that Rail Fuel Surcharges charged by Defendants were

"not supported" by fuel cost increases, one industry analyst stated that she was "puzzled by the

fact that the railroads appear to be matching fuel surcharges rather than developing their own

pricing initiatives." This was confounding because "the way to gain significant market share is

to lead the competition rather than following the competition." The fact that Defendants were

working in concert, and not unilaterally, explains their behavior.

7.      Defendants published their Rail Fuel Surcharges on their websites to facilitate

signaling, coordination, and the detection of any deviation from collusive pricing. At the same

time, Defendants did not provide information to their customers that would enable them to

evaluate the extent to which Rail Fuel Surcharges related to unanticipated fuel costs.

8.      As a direct and proximate result of this price-fixing conspiracy, Defendants have

restrained competition among unregulated rail freight transportation services and injured Plaintiff

and the members of the Class in their business and property. Plaintiff, and the other members of

the Class, paid a higher price for unregulated rail freight transportation than would have been

paid absent the concerted unlawful activity alleged herein.

## PARTIES

9.      Dad's Products Company, Inc. ("Dad's Products") is a corporation organized and

existing under the laws of the State of Pennsylvania, with its principal place of business at 18746

Mill Street, Meadville, Pennsylvania, 16335. During the Class Period, Dad's Products purchased

unregulated rail freight transportation directly from one or more of the Defendants and was

assessed a Rail Fuel Surcharge in connection with that purchase.

10.     Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. In Chicago, BNSF operates BNSF Logistics Park, which serves as the national center for the company's logistics services. BNSF maintains major intermodal hubs at Logistics Park and Corwith Yard, Chicago. In 2006, these sites represented, respectively, BNSF's third and second largest facilities in terms of lift volume. (Four of BNSF's top ten intermodal hubs are located in Illinois.) BNSF also operates and serves rail terminals in Cicero and Hodgkins, Illinois. BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the Western United States, extending into the Southeastern states.

11.     Defendant CSX Transportation, Inc., ("CSX") has its principal place of business at 500 Water Street, Jacksonville, Florida, 32202. CSX maintains an operation center in Calumet City, Illinois and major rail yards in Chicago, Riverdale, and Bedford Park. CSX has railway lines throughout the Eastern United States. In Illinois, CSX maintains more than 1,000 miles of track and employs more than 1,000 of the State's residents.

12.     Defendant Kansas City Southern Railway Company ("KCSR") has its principal place of business at 427 West 12th Street, Kansas City, Missouri, 64105. KCSR originates and terminates traffic in this District by providing rail transportation in interchange service with BNSF and the Iowa, Chicago & Eastern Railroad Company. KCSR owns and operates major freight railroad in ten midwestern and southern states, including Illinois.

-4-

13.    Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia, 23510. NS maintains an intermodal operations center at 7600 South Western Avenue, Chicago, Illinois, 60620 and operates and serves rail terminals in Chicago. NS's network of tracks includes more than 21,000 route miles in 22 states in the Eastern US and in Ontario, Canada. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.

14.    Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska, 68179. UP maintains a regional office in Chicago at 436 West 25th Place, Chicago, Illinois, 60616, which also houses its Vice President of governmental affairs. UP operates major terminals in Chicago, Rochelle, Dolton, and Northlake, through which it originates and terminates rail traffic. UP owns the Belt Railway Company of Chicago, and the Chicago Southshore and South Bend Railroad (both located in Chicago), and operates four intermodal facilities in Illinois. According to the company's website, "Illinois is a key state for Union Pacific Railroad," as main-line tracks from southern Illinois and St. Louis enter Chicago from the south, and UP's east-west transcontinental line across Illinois terminates at the company's Proviso Yard in Northlake. UP operates 2,247 miles of track in Illinois and employs more than 4,000 of the State's residents. UP serves primarily the western two-thirds of the US and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country.

15.    Chicago is the only city where the major US and Canadian Class I railroads come together to interchange freight. Annually, rail freight with a value of approximately $350 billion moves through Chicago. Freight railroads in Chicago own 74 marshalling yards, including 17 for rail-truck intermodal traffic, and operate an estimated 1,200 daily trains. Due to its position

as the nation's most important rail crossroads, major rail flows move between Chicago and all regions of the US.

## JURISDICTION AND VENUE

16.     This action is brought under Section 4 of the Clayton Act, 15 U.S.C. §15, to recover treble damages and reasonable attorneys fees from Defendants for the injuries sustained by Plaintiff and members of the Class by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

17.     Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C.§§ 1331 and 1337.

18.     Venue is proper in this District pursuant to 15 U.S.C. §15(a) and 22 and 28 U.S.C. §1391. Defendants maintain offices, have agents, transact business, and are found within this judicial District; a substantial part of the events giving rise to the claims for relief occurred in this District; and Defendants regularly and continuously conduct business in interstate commerce that is carried out in part in this District.

19.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action under Rules 23(a) and (b)(3) of the

Federal Rules of Civil Procedure, on behalf of itself and others similarly situated. The "Class" is

defined as:

> All purchasers of rail freight transportation services from
> Defendants, through use of private railroad-shippers contracts or
> through other means exempt from rate regulation under federal
> law, as to which Defendants assessed a Rail Fuel Surcharge, at any
> time from at least as early as July 1, 2003 to the present (the "Class
> Period"). Excluded from the Class are Defendants, any
> subsidiaries or affiliates of Defendants, any of Defendants' co-
> conspirators, whether or not named in this Complaint, and
> governmental entities (the "Class").

21.     Because such information is in the exclusive control of Defendants, the exact

number of Class members is unknown to Plaintiff as this time. Due to the nature and magnitude

of the trade and commerce involved, however, Plaintiff believes that the members of the Class

number, at least, in the thousands and are geographically dispersed throughout the United States

so that joinder of all class members would be impracticable. Plaintiff further believes the

members of the Class can be readily ascertained from Defendants' books and records.

22.     Plaintiff's claims are typical of the claims of the other members of the Class.

Plaintiff and all members of the Class directly purchased unregulated rail freight transportation

from Defendants, with respect to which Defendants imposed the artificially inflated Rail Fuel

Surcharges established and maintained by the actions of Defendants in connection with the

restraint of trade alleged herein.

23.     Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class action and antitrust litigation.

24.      Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether Defendants conspired, contracted, and/or combined with others, for the purpose or with the effect of raising, fixing, maintaining, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services purchased by the Class;

b.      the duration of the conspiracy, contract, or combination alleged in this Complaint;

c.      the nature and character of the acts performed by Defendants in furtherance of the conspiracy, contract, or combination;

d.      whether Defendants' conduct violated the federal antitrust laws; and

e.      whether Defendants' conduct caused injury to the business and property of Plaintiff and the Class and, if so, the proper measure of damages.

25.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would also impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

26.    The Class has a strong and pervasive community of interest, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. No difficulty is anticipated in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

27.    During the Class Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The US market for rail transportation services was estimated at more than $51 billion in 2006.

28.    The activities of Defendants were within the flow of, and substantially affected, interstate and international commerce. During the Class Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States. Each Defendant used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services.

29.    The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## BACKGROUND

### Deregulation of the Railroad Industry

30.    Over 25 years ago, Congress transformed federal regulation of the railroad industry. After almost 100 years of economic regulation, the railroad industry was in serious economic trouble in the 1970s, with rising costs, losses, and bankruptcies. In response, Congress passed the Railroad Revitalization and Regulatory Reform Act of 1976 and the Staggers Rail Act of 1980 ("Staggers Act").

31.    Together, these pieces of legislation substantially deregulated the railroad industry. In particular, the Staggers Act encouraged greater reliance on competition to set rates and gave railroads increased freedom to price their services according to market conditions. These acts also allowed railroads and shippers to enter into contracts that set rates and prohibited the Interstate Commerce Commission ("ICC"), and later the Surface Transportation Board ("STB"), from regulating rates where railroads had either effective competition or rates negotiated between the railroad and the shipper. At the same time, the Staggers Act anticipated that some shippers might not have competitive alternatives – commonly referred to as "captive shippers" – and the ICC (later the STB) was given the authority to establish a process whereby captive shippers could obtain relief from unreasonably high rates. (The ICC Termination Act of 1996 abolished the ICC and transferred its regulatory functions to the STB.)

32.    Today 80 percent or more of all rail shipments are exempt from rate regulation or move under private transportation contracts, which are likewise free of rate regulation.

### Railroad Consolidation

33.    During the past 30 years, the freight railroad industry has become significantly more concentrated. In 1976, there were 30 independent Class I railroad systems, consisting of 63 Class I railroads, operating in the United States. Currently, there are seven Class I railroads (two of which are owned by Canadian entities). (As of 2004, a Class I railroad is any railroad with operating revenue over $277.7 million.) Nearly half of that reduction was attributable to consolidations.

34.    By the early 2000's, the industry had consolidated to the point where further mergers were unlikely, if not impossible. In response to the proposed Burlington Northern Santa

Fe ("BNSF") and Canadian National Railway Co. ("CN") merger, the STB placed a moratorium on new mergers and promulgated more stringent standards for merger review.

## Defendants Introduce Fuel Surcharges

35.     Following deregulation, railroad rates declined for a time. Railroad rates generally declined between 1985 and 2001, but they began to increase in 2001 and increases continued through 2006. During the period of rate increases, Defendants also began shifting certain costs to shippers, including by introducing Rail Fuel Surcharges. As further explained below, this has allowed Defendants to coordinate rate increases, through the guise of surcharges which are purported to be related to cost recovery.

36.     After passage of the Staggers Act in 1980, railroads began entering into transportation contracts with cost escalation provisions often tied to the "Rail Cost Adjustment Factor" ("RCAF"). The RCAF was published by the Association of American Railroads ("AAR"), the industry trade association, and included fuel prices as a component of the cost escalation. In the fourth quarter of 2002, the AAR – which is controlled by the Class I railroads (*i.e.* the Defendants) – published, for the first time, a RCAF without a fuel component. This decision to remove fuel costs from the RCAF index facilitated Defendants' ability to begin assessing separate Rail Fuel Surcharges and coordinating that practice.

37.     Following publication of the RCAF index without fuel, or the "All-Inclusive Index Less Fuel" ("All-LF"), Defendants began to apply a Rail Fuel Surcharge as a separate item on a shipper's bill. When the price of oil began to rise in late 2003 and early 2004, Defendants saw that they could use monthly changes to the fuel surcharge as an easy way to increase their revenues without having to renegotiate individual contracts or wait for new rail capacity to come on line – so long as all Defendants participated and did not undercut each other.

## DEFENDANTS' PRICE-FIXING CONSPIRACY

38.    Commencing in or about July, 2003 or earlier, Defendants agreed to begin coordinating the prices they charged rail shippers and customers for carload shipments. The key element of this price-fixing conspiracy was an agreement by Defendants to act in concert with one another in demanding Rail Fuel Surcharges from rail shippers and customers and by agreeing to compute Rail Fuel Surcharges as a percentage of the base rail-freight rate paid by customers (*i.e.,* revenue).

39.    Such a "revenue-based" fuel surcharge bears no direct relationship to Defendants' actual increase in fuel costs. This is in part because railroads rely on differential pricing, under which rates are dependent on factors other than cost. Thus, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate, it will pay dramatically more in fuel surcharges. Indeed, Defendants have acknowledged that their fuel surcharge program is not a cost recovery mechanism, but a revenue enhancement measure intended to achieve across-the-board increases in the prices charged by Defendants for unregulated rail freight transportation.

40.    Defendants implemented their agreement by exchanging information both in private and by publicly announcing agreed-upon surcharge increases and posting the monthly fuel surcharge percentages on their websites. This was done for purposes of monitoring and enforcing the agreed-upon Rail Fuel Surcharge levels. At the same time, Defendants did not provide to their customers information that would enable the customers to determine the relationship between the Rail Fuel Surcharges and Defendants' unanticipated fuel cost increases.

41.    As a result of Defendants' concerted action, prices of Rail Fuel Surcharges charged to rail shippers and customers (members of the Class) were raised to or maintained at supracompetitive levels throughout the Class Period.

42.    On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for regulated rail freight transport was an "unreasonable practice," because, *inter alia*, the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007).

43.    The STB also found that the railroads had been "double dipping" – applying to the same traffic both a fuel surcharge and a rate increase that is based on the RCAF or another index that includes a fuel cost component. The STB ordered Defendants to change these practices. The STB's decision addressed rate regulated rail freight traffic only (which is not the subject of this Complaint). The STB stated that its decision does not apply to rail freight traffic under contract or otherwise exempted from rate regulation.

44.    Defendants applied the same unreasonable fuel surcharge practices to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

## ELEMENTS OF THE PRICE-FIXING CONSPIRACY

45.    Defendants' conspiracy involved an agreement to employ Rail Fuel Surcharges not as a cost recovery mechanism for the transportation to which the surcharge was applied, but as a multiplier percentage of the base rate charged for the rail freight transportation involved.

46.    Defendants began to implement their conspiracy at least as early as June, 2003 when the two western railroads, BNSF and UP (the "Western Railroads"), agreed to coordinate

their prices relative to Rail Fuel Surcharges. Prior to this time, the UP carload fuel surcharge was adjusted monthly based on the West Texas Intermediate Crude Oil Index (the "WTI Index"). The BNSF carload fuel surcharge was based on the US Department of Energy On-Highway Diesel Fuel Price Index (the "HDF Index"). In or about June, 2003, however, UP switched to the HDF Index pursuant to an agreement with BNSF. From that point on, the Western Railroads moved in lockstep and charged the *exact same* Rail Fuel Surcharge percentage for each month of the Class Period.

47.    The Western Railroads agreed to administer the HDF Index in precisely the same way. When the US average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF Index exceeded $1.35 per gallon, however, the Western Railroads both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, the Western Railroads would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increased in the HDF Index.

48.    The Western Railroads also coordinated when they would change their Rail Fuel Surcharge. They agreed that the surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF average price calculation. For example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

49.     The choice to use the HDF Index for setting the fuel surcharge was arbitrary.
Other indices exist, for example, that would potentially be more desirable to customers. The
HDF Index price is essentially the average retail price paid at truck stops and service stations for
diesel fuel, and it includes taxes. However, the Western Railroads buy their fuel in bulk, at
wholesale not retail prices, and without having to pay certain taxes. These and other differences
introduce a high level of variability in the fluctuations between the HDF Pricing Index and the
Western Railroads' actual incremental fuel costs. For example, according to BNSF's investor
reports, BNSF's average cost for diesel fuel in the third quarter rose by 14.4 percent from 2003
to 2004. In contrast, the average HDF Index price over the same period increased by 25.3
percent. Thus, under BNSF's fuel surcharge, BNSF shippers would have been forced to pay on
an incremental basis almost double the increase BNSF actually incurred for its diesel fuel costs.
Indeed, under the use of the HDF Index, Rail Fuel Surcharges can increase even when
incremental fuel costs have not changed, or even when they have decreased – if non-fuel index
costs increase.

50.     Also arbitrary was the decision by the Western Railroads to set the trigger point
at $1.35 per gallon and to apply the surcharge in the second calendar month after the HDF
average price had changed. The fact that the Western Railroads chose and adhered to the same
index and the same combination of features for their Rail Fuel Surcharge programs is evidence
that they coordinated their behavior. The similarities are too precise and too comprehensive to
have been arrived at naturally and unilaterally.

51.     Using the HDF Index, the two Western Railroads moved in lockstep and charged
virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

52.    The chart below shows that the Fuel Surcharge Percentages charged by the Western Railroads for carload shipments varied before the Class Period began, but were identical starting in July, 2003:

### MONTHLY SURCHARGE PERCENTAGES – WESTERN RAILROADS

| MONTH | BNSF | UP |
|-------|------|-----|
| Jun – 02 | 1 | 0 |
| Jul – 02 | 1 | 0 |
| Aug – 02 | 0 | 0 |
| Sep -02 | 0 | 0 |
| Oct – 02 | 1% | 0 |
| Nov – 02 | 2% | 0 |
| Dec – 02 | 2.5% | 0 |
| Jan – 03 | 2% | 2 |
| Feb-03 | 2% | 2 |
| Mar – 03 | 2.5% | 2 |
| Apr – 03 | 4.5% | 2 |
| May – 03 | 2% | 2 |
| Jun – 03 | 3.0% | 2.0% |
| **Jul – 03** | **2.5%** | **2.5%** |
| Aug – 03 | 2.0% | 2.0% |
| Sep – 03 | 2.5% | 2.0% |
| Oct – 03 | 2.5% | 2.5% |
| Nov – 03 | 2.5% | 2.5% |
| Dec – 03 | 2.5% | 2.5% |
| Jan – 04 | 2.5% | 2.5% |
| Feb – 04 | 2.5% | 2.5% |
| Mar – 04 | 3.5% | 3.5% |
| Apr -04 | 3.5% | 3.5% |
| May - 04 | 4.0% | 4.0% |
| Jun – 04 | 4.5% | 4.5% |
| Jul - 04 | 5.0% | 5.0% |
| Aug – 04 | 5.0% | 5.0% |
| Sep – 04 | 5.0% | 5.0% |
| Oct - 04 | 6.0% | 6.0% |
| Nov – 04 | 7.0% | 7.0% |
| Dec – 04 | 9.0% | 9.0% |
| Jan – 05 | 9.0% | 9.0% |
| Feb – 05 | 8.0% | 8.0% |
| Mar – 05 | 7.5% | 7.5% |
| Apr – 05 | 8.0% | 8.0% |

| May – 05 | 10.0% | 10.0% |
|----------|-------|-------|
| Jun – 05 | 10.5% | 10.5% |
| Jul – 05 | 9.5% | 9.5% |
| Aug – 05 | 10.5% | 10.5% |
| Sep – 05 | 11.5% | 11.5% |
| Oct – 05 | 13.0% | 13.0% |
| Nov – 05 | 16.0% | 16.0% |
| Dec – 05 | 18.5% | 18.5% |
| Jan – 06 | 13.5% | 13.5% |
| Feb – 06 | 12.0% | 12.5% |
| Mar – 06 | 12.5% | 12.5% |
| Apr – 06 | 12.5% | 12.5% |
| May – 06 | 13.5% | 13.5% |
| Jun – 06 | 15.0% | 15.0% |
| Jul – 06 | 16.5% | 16.5% |
| Aug – 06 | 16.5% | 16.5% |
| Sep – 06 | 17.0% | 17.0% |
| Oct – 06 | 18.0% | 18.0% |
| Nov – 06 | 15.5% | 15.5% |
| Dec – 06 | 13.0% | 13.0% |
| Jan – 07 | 13.0% | 13.0% |
| Feb – 07 | 14.0% | 14.0% |
| Mar – 07 | 12.5% | 12.5% |

53.    Defendants CSX and NS, located in the East, began to implement the conspiracy in February, 2004 or earlier. Defendant KCSR, located in the Midwest, agreed to join the conspiracy in June, 2005 or earlier. (Defendants CSX, NS, and KCSR collectively are the "Eastern Railroads"). The Eastern Railroads all agreed to base their fuel surcharge programs on the average monthly price of WTI as published in the *Wall Street Journal*. Indeed, not only did these railroads all agree to use the WTI Index (as opposed to many other available indices), once they joined the conspiracy, they too agreed to administer the index in precisely the same way.

54.    Specifically, after an initial period in which their selected WTI trigger price differed, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel. When that happened, Defendants' rates were increased 0.4 percent for every $1 dollar that the price of WTI oil exceeded $23 per barrel. So, for example, if

the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

55.    The Eastern Railroads also coordinated when they would change their fuel surcharge – two calendar months after the WTI index had adjusted – thereby adopting the same timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants could apply the exact same fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

56.    The choice to use the WTI Index for fuel surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the average price of WTI oil had changed. The fact that Defendants CSX, NS, and KCSR all chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior. The similarities are too precise and too comprehensive to have been arrived at naturally and unilaterally.

57.    The net result is that there was uniformity among the Eastern Railroads in the monthly surcharge percentages they charged customers for most of the Class Period. Although KCSR used different fuel surcharge percentages for certain months of the Class Period, in June, 2005 it adopted the same fuel surcharge percentage used by CSX and NS and moved in lock step with them for the remainder of the Class Period. KCSR has different operations and fuel

consumption patterns from the larger US railroads, making it unlikely that KCSR would adopt the same fuel surcharge percentages as the other railroads absent concerted conduct.

58. The chart below shows that the Fuel Surcharge Percentages charged by Defendants CSX and NS for carload shipments varied before the Class Period, but were identical starting in February, 2004, and they also were identical to those of the KCSR starting in June, 2005, when KCSR joined the conspiracy:

## MONTHLY SURCHARGE PERCENTAGES – EASTERN RAILROADS

| MONTH | CSX | NS | KCSR |
|---|---|---|---|
| Jun – 03 | 2.4% | 2% | |
| Jul – 03 | 2.4% | 2% | |
| Aug – 03 | 3.2% | 2% | |
| Sep – 03 | 3.2% | 2% | |
| Oct – 03 | 3.6% | 2% | |
| Nov – 03 | 2.4% | 2.0% | |
| Dec – 03 | 3.2% | 2.0% | |
| Jan – 04 | 3.6% | 2.0% | |
| Feb – 04 | 4.0% | 2% | |
| **Mar – 04** | **4.8%** | **4.8%** | |
| Apr -04 | 4.8% | 4.8% | |
| May - 04 | 5.6% | 5.6% | |
| Jun – 04 | 5.6% | 5.6% | |
| Jul - 04 | 7.2% | 7.2% | |
| Aug – 04 | 6.4% | 6.4% | |
| Sep – 04 | 7.2% | 7.2% | |
| Oct - 04 | 8.8% | 8.8% | |
| Nov – 04 | 9.2% | 9.2% | |
| Dec – 04 | 12.4% | 12.4% | 10.0% |
| Jan – 05 | 10.4% | 10.4% | 10.0% |
| Feb – 05 | 8.4% | 8.4% | 10.0% |
| Mar – 05 | 9.5% | 9.5% | 10.0% |
| Apr – 05 | 10.0% | 10.0% | 10.0% |
| May – 05 | 12.8% | 12.8% | 10.0% |
| **Jun – 05** | **12.4%** | **12.4%** | **12.4%** |
| Jul – 05 | 10.8% | 10.8% | 10.8% |
| Aug – 05 | 13.6% | 13.6% | 13.6% |
| Sep – 05 | 14.4% | 14.4% | 14.4% |
| Oct – 05 | 16.8% | 16.8% | 16.8% |

| Nov – 05 | 17.2% | 17.2% | 17.2% |
| Dec – 05 | 16.0% | 16.0% | 16.0% |
| Jan – 06 | 14.4% | 14.4% | 14.4% |
| Feb – 06 | 14.8% | 14.8% | 14.8% |
| Mar – 06 | 17.2% | 17.2% | 17.2% |
| Apr – 06 | 15.6% | 15.6% | 15.6% |
| May – 06 | 16.0% | 16.0% | 16.0% |
| Jun – 06 | 18.8% | 18.8% | 18.8% |
| Jul – 06 | 19.2% | 19.2% | 19.2% |
| Aug – 06 | 19.2% | 19.2% | 19.2% |
| Sep – 06 | 20.8% | 20.8% | 20.8% |
| Oct – 06 | 20.4% | 20.4% | 20.4% |
| Nov – 06 | 16.4% | 16.4% | 16.4% |
| Dec – 06 | 14.4% | 14.4% | 14.4% |
| Jan – 07 | 14.8% | 14.8% | 14.8% |
| Feb – 07 | 16.0% | 16.0% | 16.0% |
| Mar – 07 | 12.8% | 12.8% | 12.8% |

59.    In contrast to this uniformity in fuel surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the East and the West, would naturally and unilaterally price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that Defendants moved in uniform lockstep for a period of nearly 38 months – in the face of significant shipper opposition – indicates that Defendants were coordinating their behavior in order to thwart competition and that they conspired to fix prices for Rail Fuel Surcharges. In a competitive environment, free of collusion, carriers with lower fuel costs would impose a lower surcharge to obtain a competitive advantage.

60.    As some industry analysts observed, Defendants conduct is "puzzling" or "surprising," to say the least, if viewed as unilateral conduct. Since "the way to gain significant market share is to lead rather than follow the competition," one industry analyst noted in 2003, "I was puzzled by the fact that the railroads appear to be matching fuel surcharges rather than

developing their own pricing initiatives." Similarly, an economic consulting firm examining the industry in 2006, found it "suprising[]" that "Class I Railroads have each adopted Fuel Surcharge designs which share the same flawed structure of applying a cost increase to revenue." The explanation is that Defendants' conduct was not unilateral conduct, but concerted action designed to reap inflated profits by sabotaging competition.

## ADDITIONAL EVIDENCE OF A CONSPIRACY

61.    Apart from this direct evidence of price fixing, "plus factors" further support the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation industry is marked by certain structural and other characteristics that made Defendants' price-fixing cartel feasible:

(a)    As discussed above, the railroad industry is highly concentrated. Defendants in this case are the five remaining domestic Class I railroads following decades of mergers and consolidation. Defendants account for well over 90 percent of the nation's rail traffic.

(b)    There are significant barriers to entry into the railroad industry. To enter, railroads must invest in a vast network of tracks, stations, yards, and switching facilities. These may take decades to develop and require onerous regulatory and environmental reviews and approval. Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power. Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, fixed costs are largely sunk. Successful entry also requires that a new entrant capture a significant market share from existing carriers. Entry is thus both expensive and risky.

(c)    Rail Fuel Surcharges, as employed by Defendants, are highly standardized. Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then published

the percentages on their websites so they could police their concerted conduct effectively and without frequent communications.

(d)     The railroad industry has a history of price fixing and other anticompetitive behavior. In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n,* 166 U.S. 290 (1897), the railroad cartel argued that it must price fix or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate making committees." Although these bodies have disappeared from the rail industry in the wake of the Staggers Act, the railroad industry has continued to engage in market manipulation, unreasonable rate practices, and other discriminatory practices against a wide spectrum of freight customers.

(e)     Defendants' Chief Executive Officers are board members of the AAR, the industry's trade association, which facilitates collusion and transfer of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry." Full membership, however, is available only to the seven Class I railroads operating in the United States, the five most significant of which are Defendants here (the other two Class I railroads are owned by Canadian companies). The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

62.     Apart from these structural market features, Defendants did not behave as if they were in a competitive market. Shippers from many different industries, some with significant economic power, tried to negotiate fuel surcharge percentages, but were told by Defendants that the Rail Fuel Surcharges were "not negotiable."

63.     National shippers organizations met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier. The other Defendants refused to address the concerns of their customers.

64.     At or about the time Defendants agreed to fix the Rail Fuel Surcharges, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly, or monthly. Previously, Defendants had allowed, and often preferred, long-term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point or that excluded fuel surcharges altogether.

65.     Defendants made this switch even though most shippers preferred the former system in order to minimize risk. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk.

66.     Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad and a single fee would be allocated among the railroads that shipped. Instead, Defendants moved to what is known in the industry as "Rule 11 pricing." Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment. Defendants made this change as part of their conspiracy for two reasons:

to provide transparency as to what each railroad was charging on multiple line shipments and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

67.    Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet Defendants' market shares remained relatively stable and constant. The fact that market shares did not fluctuate significantly during the Class Period is further indication that Defendants agreed to collude rather than to compete for new sales.

## DEFENDANTS PROFITED FROM THE SURCHARGES

68.    As discussed, since the beginning of the Class Period and before, Defendants have used the Rail Fuel Surcharge not as a cost recovery mechanism, but as a revenue enhancement measure. By computing the Rail Fuel Surcharge as a percentage of the base rate charged to the shipper, Defendants ensured that there would not be real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge is applied.

69.    The ratio of Defendants' profits to their actual fuel costs was high as a result of the concerted implementation and maintenance of the agreed-upon Rail Fuel Surcharge. Through these Rail Fuel Surcharges, Defendants have realized billions of dollars in revenues during the Class Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge.

## ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

70.    The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

> a.    the Rail Fuel Surcharges charged to Plaintiff and the Class for unregulated rail freight transportation have been fixed or stabilized at supracompetitive levels;

-24-

b.    Plaintiff and the Class have been deprived of the benefits of free, open,

and unrestricted competition in the market for unregulated rail freight

transportation; and

c.    competition in establishing the prices paid in the United States for

unregulated rail freight transportation has been unlawfully restrained, suppressed,

and eliminated.

71.    By reason of the violations of Section 1 of the Sherman Act and Section 4 of the

Clayton Act, Plaintiff and the members of the Class have sustained injury to their business or

property. The injury sustained by Plaintiff and the Class is the payment of supracompetitive

prices for Rail Fuel Surcharges applied to unregulated rail freight transportation as a result of

Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an

antitrust injury of the type that the federal laws were meant to punish and prevent.

## COUNT I

### (Violations Of § 1 Of The Sherman Act And § 4 Of The Clayton Act)

72.    Plaintiff incorporates by reference the allegations in the above paragraphs as if

they were fully set forth herein.

73.    Defendants entered into and engaged in a contract, combination, or conspiracy in

unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the

Clayton Act.

74.    The contract, combination, or conspiracy resulted in an agreement, understanding,

or concerted action between and among Defendants in furtherance of which Defendants fixed,

maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation

handled through private contracts and other means exempt from regulation. Such contract,

combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is an unreasonable and unlawful restraint of trade.

75.     Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was accomplished through mutual understandings or agreements by, between, and among Defendants.

76.     The contract, combination, or conspiracy has had the following effects:

a.     prices charged to Plaintiff and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supra-competitive levels;

b.     Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

c.     competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

77.     As a proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiff prays for relief as follows:

(1)     That the Court determine that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be denominated as a Class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

(2)     That the unlawful contract, combination, and conspiracy alleged in Count 1 be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(3)     That Plaintiff and the Class recover treble damages, as provided by law;

(4)     That Plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

(5)     For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(e) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: May 25, 2007             Respectfully submitted,

Carol V. Gilden
**Cohen, Milstein, Hausfeld & Toll, P.L.L.C.**
39 S. LaSalle Street, Suite 1100
Chicago, Illinois 60603
Tel: 312-357-0370
Fax: 312-357-0369

Michael D. Hausfeld
Benjamin D. Brown
**Cohen, Milstein, Hausfeld & Toll. P.L.L.C.**
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005
Tel: 202-408-4600
Fax: 202-408-4669

Steig D. Olson
**Cohen, Milstein, Hausfeld & Toll, P.L.L.C.**
150 East 52nd Street, Thirtieth Floor
New York, N.Y. 10022
Tel: 212-838-7797
Fax: 212-838-7745

Arthur N. Bailey
**Arthur N. Bailey & Associates**
111 West Second Street, Suite 4500
Jamestown, N.Y. 14701
716-664-2967
716-664-2983

*Attorneys for Plaintiff*

DENLOW, TERMED, TRANSFER

# United States District Court
# Northern District of Illinois - CM/ECF LIVE, Ver 3.0 (Chicago)
# CIVIL DOCKET FOR CASE #: 1:07-cv-02954

Dad's Products Company, Inc. v. BNSF Railway
Company et al
Assigned to: Honorable Samuel Der-Yeghiayan
Cause: 15:1 Antitrust Litigation

Date Filed: 05/25/2007
Date Terminated: 11/29/2007
Jury Demand: Both
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

## Plaintiff

**Dad's Products Company, Inc.**
*on behalf of itself and all others*
*similarly situated*

represented by **Carol V Gilden**
Cohen Milstein Hausfeld & Toll,
PLLC
190 S. LaSalle Street
Suite 1705
Chicago, IL 60603
(312) 357-0370
Fax: (312) 357-0369
Email: cgilden@cmht.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

## Defendant

**BNSF Railway Company**

## Defendant

**CSX Transportation, Inc.**

## Defendant

**Kansas City Southern Railway**
**Company**

## Defendant

**Norfolk Southern Railway**
**Company**

## Defendant

## Union Pacific Railroad Company

| Date Filed | # | Docket Text |
|---|---|---|
| 05/25/2007 | 1 | COMPLAINT filed by Dad's Products Company, Inc.; Jury Demand.(cdy, ) (Entered: 05/30/2007) |
| 05/25/2007 | 2 | CIVIL Cover Sheet (cdy, ) (Entered: 05/30/2007) |
| 05/25/2007 | 3 | ATTORNEY Appearance for Plaintiff Dad's Products Company, Inc. by Carol V Gilden (cdy, ) (Entered: 05/30/2007) |
| 06/01/2007 | 5 | MINUTE entry before Judge Samuel Der-Yeghiayan :Initial status hearing set for 08/07/07 at 9:00 a.m. At least four working days before the initial status hearing, the parties shall conduct a FRCP 26(f) conference and file a joint written Initial Status Report, not to exceed five pages in length, and file the Court's Joint Jurisdictional Status Report and deliver courtesy copies to this Court's chambers. The Court's standing orders on the Initial Status Report and Joint Jurisdictional Status Report maybe obtained from Judge Der-Yeghiayan's web page or from this Court's Courtroom Deputy. Mailed notice (mw, ) (Entered: 06/01/2007) |
| 06/05/2007 | 6 | MOTION by Unknown Dust Pro Inc. for transfer of related actions for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. Section 1407 (cdy, ) Modified on 7/5/2007 (cdy, ). (Entered: 06/12/2007) |
| 06/05/2007 | 7 | BRIEF IN SUPPORT by Unknown Dust Pro, Inc. for transfer of related actions for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. Section 1407 6 (cdy, ) Modified on 7/5/2007 (cdy, ). (Entered: 06/12/2007) |
| 06/05/2007 | 8 | REVISED schedule of actions by Dad's Products Company, Inc. (cdy, ) (Entered: 06/12/2007) |
| 06/05/2007 | 9 | CERTIFICATE of Service by Unknown Dust Pro, Inc. regarding revised schedule of actions 8, Brief in support 7, MOTION by Unknown Dust Pro, Inc. for transfer of related actions for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. Section 1407 6 (cdy, ) Modified on 7/5/2007 (cdy, ). (Entered: 06/12/2007) |

| 06/05/2007 | 10 | EXHIBIT by Plaintiff (cdy, ) (Entered: 06/12/2007) |
|---|---|---|
| 06/15/2007 | 11 | Rule 7.1 Disclosure by Dad's Products Company, Inc. (Gilden, Carol) (Entered: 06/15/2007) |
| 06/26/2007 | 12 | MEMORANDUM by plaintiff Cedar Farms Co., Inc in support of its motion for transfer of related actions to the United States District Court for the Middle District of Florida for coordination and consolidated pretrial proceedings pursuant to 28 U.S.C. section 1407. (lcw, ) Modified on 7/5/2007 (lcw, ). (Entered: 07/05/2007) |
| 06/26/2007 | 13 | LETTER from Beth R. Targan dated 6/25/07. (lcw, ) (Entered: 07/05/2007) |
| 06/26/2007 | 14 | MOTION by plaintiff Cedar Farms, Co., Inc. for transfer of related actions to the United States District Court for the Middle District of Florida for coordination and consolidated pretrial proceedings pursuant to 28 U.S.C. section 1407. (lcw, ) (Entered: 07/05/2007) |
| 06/26/2007 | 15 | NOTICE of Related Action by plaintiff Cedar Farms Co., Inc. (lcw, ) (Entered: 07/05/2007) |
| 06/26/2007 | 16 | RESPONSE by Interested Party Plaintiff Cedar Farms Co., Inc, to motion of Dust Pro, Inc's for the transfer of related actions for coordination or consolidated pretrial proceedings pursuant to 28 U.S.C. section 1407. (lcw, ) (Entered: 07/05/2007) |
| 06/26/2007 | 17 | CERTIFICATE of Service by Plaintiff Cedar Farms Co., Inc. (lcw, ) (Entered: 07/05/2007) |
| 06/26/2007 | 18 | LETTER from Scott W. Carlson dated 6/25/07. (lcw, ) (Entered: 07/05/2007) |
| 06/26/2007 | 19 | CROSS-MOTION by plaintiffs Dakota Granite Company and McIntyre Group, Ltd. for the transfer and consolidation of related antitrust actions to the District of Columbia pursuant to 28 U.S.C. section 1407. (lcw, ) Modified on 7/5/2007 (lcw, ). (Entered: 07/05/2007) |
| 06/26/2007 | 20 | MEMORANDUM Of Law by plaintiffs Dakota Granite Company and McIntyre Group, Ltd. in support of cross motion for the transfer and consolidation of related antitrust actions to the District of Columbia pursuant to 28 U.S.C. section 1407. (lcw, ) (Entered: 07/05/2007) |

| 06/26/2007 | 21 | SCHEDULE Of Actions by Cedar Farms Co, Inc. (Document Not Scanned) (lcw, ) (Entered: 07/05/2007) |
| 06/26/2007 | 22 | SCHEDULE Of Actions by Dakota Granite Company. (Document Not Scanned) (lcw, ) (Entered: 07/05/2007) |
| 07/18/2007 | 23 | LETTER from Ronald J. Aranoff dated 7/17/07 regarding MDL 1869 with documents: (1) memorandum of law in oppositon to movants request to transfer; (2) notice of appearance of Ronald J. Aranoff; (3) corporate disclosure statement; (4) notice of related action with complaint; (5) certificate of service; all documents attached to this letter (cdy, ) (Entered: 07/24/2007) |
| 07/23/2007 | 25 | LETTER from Jay S. Cohen dated 7/18/07. (lcw, ) (Entered: 07/26/2007) |
| 07/23/2007 | 26 | RESPONSE by plaintiff Cedar Farms Co., Inc's response to all motions for consolidation and transfer and in further support of its motion for consolidation and transfer to the Middle District of Florida. (lcw, ) (Entered: 07/26/2007) |
| 07/23/2007 | 27 | LETTER from Beth R. Targan dated 07/17/07. (lcw, ) (Entered: 07/26/2007) |
| 07/23/2007 | 28 | MEMORANDUM Of Law by plaintiff Quality Refractory Installation, Inc. d/b/a American Refractory Products in support of cross motion to transfer related actions to the United States District Court for the Eastern District of Pennsylvania for coordination or consolidation pretrial proceedings pursuant to 28 U.S.C. Section 1407. (lcw, ) (Entered: 07/26/2007) |
| 07/23/2007 | 29 | CROSS-MOTION by plaintiff Quality Refractory Installation, Inc. d/b/a American Refractory Products to transfer related actions to the United States District Court for the Eastern District of Pennsylvania for coordination or consolidation pretrial proceedings pursuant to 28 U.S.C. Section 1407. (lcw, ) (Entered: 07/26/2007) |
| 07/25/2007 | 24 | MINUTE entry before Judge Samuel Der-Yeghiayan : The docket reflects that there are pending motions before the MDL panel in the instant action. Initial status hearing reset to 11/06/07 at 9:00 a.m. Status hearing set for 08/07/07 is stricken. Mailed notice (mw, ) (Entered: 07/25/2007) |
| 08/08/2007 | 30 | MEMORANDUM OF LAW by Somerset Industries, Inc. in opposition to movant's Quality Refractories Installtion, Inc. |

| | | D/B/A American Refractory Products, request for transfer and consolidation of related antitrust actions to the Eastern District of Pennsylvania and in future support of movant, Dust Pro, Inc.'s motion for transfer and consolidation pursuant to 28 U.S.C. Section 1407 (cdy, ) (Entered: 08/10/2007) |
|---|---|---|
| 09/24/2007 | 31 | AMENDED complaint by Dad's Products Company, Inc. against all defendants (Gilden, Carol) (Entered: 09/24/2007) |
| 11/01/2007 | 32 | MINUTE entry before Judge Samuel Der-Yeghiayan :Status hearing set for 11/06/07 is stricken and reset to 12/18/07 at 9:00 a.m. Mailed notice (cdy, ) (Entered: 11/02/2007) |
| 11/26/2007 | 33 | LETTER from USDC for the District of Columbia dated 11/14/07. (cdy, ) (Entered: 11/29/2007) |
| 11/26/2007 | 34 | CONDITIONAL TRANSFER ORDER from the MDL Panel transferring case to District of Columbia, Washington, DC. (cdy, ) (Entered: 11/29/2007) |
| 11/29/2007 | 35 | TRANSFERRED to the District of Columbia, Washington, DC the electronic record and docket sheet via electronic transfer. Paper document(s) 10, 21, and 22 sent by certified mail, return receipt number 7007 0710 0003 4430 7744. Notice sent to all counsel of record. (cdy, ) (Entered: 11/29/2007) |
| 12/10/2007 | 36 | RETURN of US Postal Receipt no. 7007 0710 0003 4430 7744 (cdy, ) (Entered: 12/12/2007) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/19/2007 14:37:13 | | | |
| **PACER Login:** | us3871 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:07-cv-02954 |
| **Billable Pages:** | 3 | **Cost:** | 0.24 |

## *UNITED STATES DISTRICT COURT*
## *FOR THE DISTRICT OF COLUMBIA*

**DAD'S PRODUCTS CO., INC.,**

Plaintiff(s),

vs.

Civil Case No: **07-2063 PLF**

**BNSF RAILWAY CO., ET AL.,**

Defendant(s).

## <u>NOTICE REGARDING BULKY EXHIBIT</u>

Pursuant to the procedures for filing documents electronically, as outlined in the previous Order of the Court, this Notice serves as notification that transferred in document numbers *10, 21* and *22* have been filed in paper form in the Clerk's Office. It is available for public viewing and copying between the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday.

**NANCY MAYER-WHITTINGTON**

Clerk

**Date:** 12/19/07